T.C. Memo. 2019-151

UNITED STATES TAX COURT

LECIEL L. LOWERY, JR., AND CHARLENE A. LOWERY, Petitioners <u>v.</u>
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 13022-17L.                    Filed November 18, 2019.

<u>Stephen P. Kauffman</u> and <u>Terry L. Goddard, Jr.</u>, for petitioners

<u>Nancy M. Gilmore</u> and <u>David A. Indek</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

COLVIN, <u>Judge</u>: The issue for decision is whether respondent's
determination to sustain two proposed levies and the filing of two notices of
Federal tax lien was an abuse of discretion. Because the record before us contains

[*2] insufficient information to decide this issue, we will remand the case to the Internal Revenue Service (IRS) Appeals Office for further proceedings.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. Petitioners are husband and wife and resided in Maryland when they timely filed the petition.

A.    Procedural Background

As of February 7, 2018, petitioners had not paid, and they now concede they are liable for, the following amounts of Federal income tax, penalties, and interest: $58,949[1] for 2006, $100,997 for 2007, $45,128 for 2008, $64,092 for 2009, $61,668 for 2010, $65,305 for 2011, $91,225 for 2012, $80,009 for 2013, and $71,727 for 2014. On October 20, 2015, respondent issued a Final Notice of Intent to Levy and Notice of Your Right to a Hearing (levy notice) to petitioners for tax years 2006-13 (first levy notice). On October 29, 2015, respondent issued a Notice of Federal Tax Lien Filing and Your Right to a Hearing Under 6320 (lien notice) to petitioners for tax years 2008-13 (first lien notice). On December 2, 2015, respondent issued a levy notice to petitioners for tax year 2014 (second levy notice). On December 15, 2015, respondent issued a lien notice to petitioners for

---

[1]Monetary amounts are rounded to the nearest dollar. Unless otherwise indicated section references are to the Internal Revenue Code in effect at all relevant times.

[*3] tax year 2014 (second lien notice). Petitioners timely submitted Form 12153, Request for a Collection Due Process or Equivalent Hearing, for each levy and lien notice (CDP hearing requests).

Petitioners requested the CDP hearings to obtain consideration of either an installment agreement or an offer-in-compromise. The IRS Appeals officer (AO) assigned to petitioners' case calculated what the Commissioner refers to as petitioners' reasonable collection potential (RCP)[2] using Form 14561, Income and Expense/Asset Equity Calculation Table. On May 12, 2017, the AO issued to petitioners a notice of determination sustaining the collection actions for the first and second lien notices and the first levy notice and a decision letter sustaining the collection actions for the second levy notice.[3]

B.    Petitioner Husband's Employment

1.    Petitioner Husband's Duties

Petitioner husband is employed as a ship pilot (pilot) on the Chesapeake Bay. Pilots' duties include boarding foreign vessels entering Maryland waters and

---

[2]RCP is calculated on the basis of a taxpayer's net realizable equity and future income for the next 12 to 24 months (after allowing for necessary living expenses). Internal Revenue Manual (IRM) pt. 5.8.4.3.1 (Apr. 30, 2015).

[3]A decision letter was sent rather than a notice of determination because the AO had determined that the CDP hearing request for the second levy notice was untimely. Respondent now concedes that the request was timely.

**[*4]** assuming navigational control.  A pilot is taken to a ship via a smaller vessel and climbs a ladder to board the ship regardless of the weather.  Petitioner husband's 60th birthday was in 2018.  Because of the physical demands of his job, petitioner husband likely will retire from work as a pilot by 2026.

    2.      <u>Mandatory Deductions From Petitioner Husband's Income</u>

As a pilot, petitioner husband is required to be a member of the Association of Maryland Pilots (Association), which is a partnership.  Each month the Association distributes to petitioner husband an amount equal to his share of the fees received by the Association less several mandatory deductions.  Mandatory deductions comprise health insurance premiums ($1,887), life insurance premiums ($27), supplemental profit-sharing plan and section 401(k) retirement contributions ($1,000), capital contributions ($500), and political action committee (PAC) fund contributions ($75).  The Association also deducts from petitioner husband's monthly distribution $542 for a money purchase plan loan repayment (not further explained in the record) and $557 withheld for Virginia State taxes.

The AO reduced the amount that petitioners could reasonably be expected to pay each month by $1,887 for petitioner husband's monthly health insurance premiums and $27 for his monthly life insurance premiums.  The AO did not

**[\*5]** reduce the amount petitioners could reasonably be expected to pay by the amounts of the other mandatory deductions, which total $1,575, or by the reductions for the money purchase plan loan repayment ($542) and Virginia State taxes ($557), and she did not explain why she treated money not distributed to petitioners as if it were available to pay their unpaid Federal income tax.

    3.       <u>Unreimbursed Business Expenses</u>

Petitioner husband claims that he incurs expenses totaling $5,206 per month[4] in the performance of his duties as a pilot, specifically, expenses for local travel, overnight travel, specialized gear, accounting and tax services, and maintaining a home office. The AO approved $2,533 for transportation expenses,[5] which is less than one-half of petitioner husband's claimed business expenses. The Association does not reimburse its pilots for any of their business expenses or provide them with an office.

---

[4]Petitioners assert that the total amount of petitioner husband's monthly unreimbursed expenses was $5,801. The record does not show how they reached that total.

[5]That amount is included in the AO's allowance for petitioners' monthly household and court-ordered expenses ($7,189).

**[\*6]**  During the CDP hearing stage petitioners offered to provide some of their credit card records as substantiation for these expenses.  The AO did not review these records.

C.  Petitioner Husband's Retirement Account and Petitioner Wife's Pension

Petitioner husband has a retirement account with Charles Schwab that was valued at $232,838 as of October 31, 2015.  As of September 2015 petitioner wife received $433 per month from an AT&T pension plan.  Her 69th birthday was in 2018.

D.  Petitioner Wife's Family Trust

Petitioner wife is the trustee of the Donald Couch Trust, which her father established in 2006 for the benefit of petitioner wife and her two siblings.  The only asset in the trust is a house in Arizona.  The final mortgage payment was due in October 2018.  As of July 2018 the home was rented but did not generate any net income.

E.  Communications Between Petitioners and the Revenue Officer

In a letter dated March 7, 2016, written in response to Form 9297, Summary of Contact, and a phone call from a revenue officer (RO) to whom this case was assigned before its assignment to the AO, petitioners said that they wanted to refinance their home and to use the loan to make a lump-sum payment to the IRS.

[*7] Petitioners also proposed that they make an additional lump-sum payment, likely from petitioner husband's retirement account, followed by monthly payments of $2,300. However, the record suggests that petitioners were unable to obtain a home equity loan. In a letter to the AO dated August 22, 2016, petitioners said they could "only afford to commit to a monthly payment of $2,400," suggesting they were withdrawing their proposal to refinance their home and to use part of petitioner husband's retirement account to pay their back tax.

OPINION

After concessions by the parties,[6] the issue for decision is whether it was an abuse of discretion for respondent to require, as a condition of accepting an installment agreement, that petitioners pay either (1) $13,997 per month or (2) $6,341 per month for 72 months if petitioners first pay to respondent the entire amount of petitioner husband's retirement account and petitioner wife's proceeds from the sale of the house held by the trust.

A. Standard and Scope of Review

Where, as here, underlying tax liability is not in dispute, we review the Commissioner's determination for an abuse of discretion. Goza v. Commissioner,

---

[6]The parties agree that the amount of petitioners' monthly household and court-ordered expenses is $7,189 and the amount for monthly tax payments (income, FICA, and Maryland State) is $8,900.

**[\*8]** 114 T.C. 176, 182 (2000). An abuse of discretion occurs if the AO exercises his or her discretion "arbitrar[il]y, capricious[ly], or without sound basis in fact or law." Giamelli v. Commissioner, 129 T.C. 107, 111 (2007). If the AO follows all statutory and administrative guidelines and provides a reasoned, balanced decision, we will not reweigh the equities. Thompson v. Commissioner, 140 T.C. 173, 179 (2013).

In a CDP case, if we decide that a further hearing would be helpful, necessary, or productive, then we may remand the case to the IRS Appeals Office. Kelby v. Commissioner, 130 T.C. 79, 86 n.4 (2008); Lunsford v. Commissioner, 117 T.C. 183, 189 (2001).

Petitioners and respondent dispute the scope of our review. Respondent contends that our scope of review is limited to the administrative record. See Robinette v. Commissioner, 439 F.3d 455 (8th Cir. 2006), rev'g 123 T.C. 85 (2004). However, we need not decide that issue because the scope of review does not affect the result.

B.    Proposed Installment Agreements

The Commissioner and a taxpayer may enter into an installment agreement under which the taxpayer agrees to pay unpaid tax liabilities over a period of time. Sec. 301.6159-1(a), Proced. & Admin. Regs. The Commissioner has 10 years

[*9] from the date of assessment to collect unpaid taxes. Sec. 6502(a)(1). However, the Commissioner and a taxpayer may agree to extend the 10-year period in connection with an installment agreement. Sec. 6502(a)(2). The Internal Revenue Manual (IRM) instructs IRS officers to "[b]e aware of the * * * [10-year collection period] when granting installment agreements." IRM pt. 5.14.2.2(2) (Jan. 1, 2016). The IRM also states that if taxpayers cannot fully pay their unpaid tax within the 10-year period, the Commissioner may adopt a partial payment installment agreement. IRM pt. 5.14.2.1 (Mar. 11, 2011).

Petitioners proposed that they pay $6,064 per month, and respondent proposed that petitioners pay $13,997 per month.[7] Alternatively, respondent proposed that petitioners pay $6,341 per month for 72 months if they first pay to respondent (1) all of the funds in petitioner husband's retirement account (about $232,838 as of 2015) and (2) all of petitioner wife's proceeds from the sale of the house held by the trust (about $50,000). Respondent determined that if petitioners accepted either of those two options, petitioners would fully pay their unpaid tax within the 10-year collection period. See sec. 6502(a)(1). However, an installment agreement need not necessarily achieve full payment of a tax within the collection period. See secs. 6502(a)(2), 6159(a); IRM pt. 5.14.2.1.

---

[7]These amounts are taken from the parties' posttrial briefs.

**[*10] C.    Petitioners' Reasonable Collection Potential**

    1.    Mandatory Deductions

Respondent allowed two of petitioner husband's mandatory deductions ($1,887[8] for health insurance premiums and $27 for life insurance) in calculating petitioners' RCP. Petitioner husband's other mandatory deductions reduced his net income by $1,575 each month (supplemental profit-sharing plan and section 401(k) contribution of $1,000; capital contributions of $500; and PAC fund contribution of $75). In addition the partnership reduced his monthly distribution by $542 for the money purchase plan loan repayment and by $557 for Virginia State tax withholding. Respondent did not reduce petitioners' RCP on the basis of those amounts.

The IRM states that "the amount of disposable income * * * available to apply to the tax liability" is "gross income less all allowable expenses". IRM pt. 5.15.1.2(1) (Nov. 17, 2014). Allowable expenses include necessary expenses, which are expenses that are necessary to provide for the taxpayers' health, welfare, and/or production of income. See IRM pt. 5.15.1.7 (Oct. 2, 2012); IRM

---

[8]In a letter dated December 20, 2016, petitioners assert that the health insurance premiums were going to increase to $2,284 and state that they would send substantiation of this change when it occurred. The record does not show whether the increase occurred.

[*11] pt. 5.15.1.10(3) (Nov. 17, 2014).  Necessary expenses include "[i]nvoluntary [d]eductions", which are necessary "if * * * [the expense] is a requirement of the job."  IRM pt. 5.15.1.10(3).

The AO did not treat amounts required to be withheld from petitioner husband's distribution as reducing the amount of income available to petitioners because those expenses "were not allowed as expenses per the IRM."  The AO did not cite an IRM provision to support that position or explain how her determination relates to the IRM text quoted above.  On remand, the Appeals Office will have an opportunity to articulate the basis on which it determined that amounts subtracted from petitioner husband's distribution should be treated as available to pay petitioners' unpaid tax liabilities.

2.    Unreimbursed Expenses

Petitioners contend that petitioner husband spends $5,206 each month for unreimbursed job expenses comprising $2,030 for local travel (in addition to the $2,533 approved by the AO), $1,033 for overnight travel, $503 for specialized gear, $640 for professional accounting and tax services, and $1,000 per month to maintain a home office.  When the AO initially reviewed petitioners' file around July 11, 2016, she concluded that petitioner husband's unreimbursed business expenses were "average expenses" and "appeared to be * * * normal household

[*12] expenses." During the CDP hearing on December 22, 2016, petitioners stated how the expenses related to petitioner husband's job. The record does not show how the AO determined that petitioner husband's unreimbursed business expenses in excess of the amount respondent allowed as transportation expenses (assuming petitioner husband had business expenses in the amounts he reported) were average and normal household expenses.

Respondent contends that petitioners did not substantiate any of their reported unreimbursed expenses and that there is no evidence showing that petitioners were willing to deliver this information to the AO. We disagree. In a letter dated December 20, 2016, petitioners told the AO:

> We also have several pages of 2016 American Express Charge Card statements that substantiate and support other asserted non-reimbursed business expenses. There are over 25 pages of these documents. Please advise if you would like * * * [us] to forward those documents to you and how you would like * * * [us] to forward them to you.

During the meeting on December 22, 2016, petitioners offered to provide documents substantiating the unreimbursed expenses. During a meeting on January 11, 2017, the AO asked petitioners to provide the amounts of petitioner husband's business expenses for 2011-15 reported on petitioners' Forms 1040,

[*13] U.S. Individual Income Tax Return.  The AO did not ask petitioners to provide the credit card statements.

Respondent contends that the AO did not consider the credit card statements because the statements covered only a six-month period in 2016 and that the AO was using a five-year average to determine income.  Without reviewing the offered records the AO determined that petitioners' reported unreimbursed expenses were not allowable beyond the $2,533 amount the AO allowed for transportation expenses.  On remand the Appeals Office will presumably review petitioners' credit card statements, determine whether or to what extent to reduce the RCP based on petitioner husband's reported unreimbursed expenses, and provide reasons for that determination.

### 3.     Sale of the House Held by the Donald Couch Trust

The only asset held by the Donald Couch Trust is a house in Arizona.  The AO determined that before she could accept an installment agreement in which petitioners would pay $6,341 per month, petitioner wife must sell the house held by the trust and pay her share of the proceeds to respondent.

The trust instrument states that petitioner wife, as trustee, has discretionary powers to sell all real property held in the trust and distribute the proceeds to the beneficiaries without "permission from anyone or any organization, including any

[*14] remainder beneficiary."[9]  Respondent contends that the trust instrument

authorizes petitioner wife to sell the Arizona home and distribute one-third of the

proceeds to herself.  The record does not show whether the AO considered

Arizona law concerning the trust instrument when determining that the house must

be sold as one of the conditions of respondent's agreement to accept a monthly

installment payment of $6,341.

Arizona trust law provides both default and mandatory rules for trusts.

Ariz. Rev. Stat. Ann. sec. 14-10105 (2009).[10]  Mandatory rules apply regardless of

the trust instrument.  The mandatory rules, in pertinent part, state that a trustee has

a duty to act in good faith and that the trust and its terms must be "for the benefit

of its beneficiaries."  Id. subsec. (B)(2) and (3).  Arizona law also provides that

"[n]otwithstanding the breadth of discretion granted to a trustee in the terms of the

trust, * * * the trustee shall exercise a discretionary power in good faith as to only

---

[9]A remainder beneficiary is "a person entitled to receive principal when an income interest ends."  Ariz. Rev. Stat. Ann. sec. 14-7401(11) (2009).  The trust instrument does not define remainder beneficiaries.

[10]Arizona adopted a new trust code, which became effective on January 1, 2009.  The new code "applies to all trusts created before, on or after January 1, 2009."  Arizona Trust Code, sec. 18(a)(1), 2008 Ariz. Sess. Laws 1119, 1179.  Consequently, we have cited the text from the new trust code, even though the Donald Couch Trust was established in 2006.

[*15] beneficiaries of the trust and creditors of the trust".[11] Id. sec. 14-10814(A) (2009). On remand the Appeals Office should consider whether or under what circumstances, under Arizona law, petitioner wife may sell the house to pay petitioners' unpaid Federal income tax.

4.      Liquidation of Petitioner Husband's Retirement Account

Petitioner husband's retirement account with Charles Schwab was valued at $232,838 as of October 31, 2015. On February 5, 2016, the RO completed the Form 9297. The IRS uses Form 9297 to request information from a taxpayer to "calculate/verify the * * * [taxpayer's] ability to pay the tax delinquencies." In that form, under "[i]nformation/[d]ocuments required", the RO wrote: "[L]iquidate Charles Schwab investment account and use [the] proceeds to make full/partial payment towards the outstanding tax liabilities."

IRM pt. 5.14.1.4(5) (Sept. 19, 2014),[12] states that "[i]f Taxpayers have equity in assets that could be used to fully or substantially satisfy balance due accounts, [the Commissioner's personnel should] explore the possibility of

---

[11]Creditors cannot compel a trustee to distribute trust assets, with an exception for court orders requiring that child support or maintenance be paid from the trust. See Ariz. Rev. Stat. Ann. secs. 14-10814(A), 14-10504(B) (2009). Whether respondent is considered a creditor of the trust is undetermined.

[12]Respondent cites IRM pt. 5.14.1.5(5) but apparently intended to cite IRM pt. 5.14.1.4(5) (Sept. 19, 2014).

[*16] liquidating or borrowing against those assets, <u>unless</u> * * * factors such as advanced age, ill-health, or other special circumstances are determined to prevent the liquidation of the assets". (Emphasis added.) During their discussions with the AO petitioners argued that because petitioner husband was nearing retirement his retirement account should not be required to be liquidated in its entirety to pay petitioners' tax obligations.

Respondent contends that during the CDP hearing stage petitioners did not provide information about the timing of petitioner husband's retirement. We disagree. In a letter dated March 7, 2016, petitioners said that petitioner husband's job "is extremely difficult and extremely dangerous * * * [and that] there is a very real danger and potential for serious injury each day * * * [he] goes to work" and that he would likely retire by 2026. Respondent further argues that even if petitioner husband is nearing retirement age as a pilot, "eight years [from the date of trial] is a long enough period in which to make alternative arrangements for retirement income." We are unsure on what basis respondent concluded that eight years is long enough for petitioners to accumulate retirement savings in addition to fulfilling their other financial obligations.

The AO determined that as a condition to an agreement by respondent to accept monthly payments of $6,341 (rather than $13,997) petitioner husband's

[*17] retirement account must be liquidated.  On remand the Appeals Office should consider whether or to what extent, in light of petitioner husband's employment and age, liquidation of his retirement account should be required as a condition of accepting an installment payment agreement.

D.    Conclusion

On the basis of this record we are unable to conclude whether it was an abuse of discretion for respondent to require, as a condition of accepting an installment payment agreement, that petitioners pay either (1) $13,997 per month or (2) $6,341 per month for 72 months if petitioners first pay to respondent the entire amount of petitioner husband's retirement account and petitioner wife's proceeds from the sale of the house held by the trust.  We may remand when the AO did not develop a record sufficient for judicial review, see Hoyle v. Commissioner, 131 T.C. 197, 204-205 (2008), supplemented by 136 T.C. 463 (2011); Churchill v. Commissioner, T.C. Memo. 2011-182, and ask the Appeals Office to clarify the record, see Gurule v. Commissioner, T.C. Memo. 2015-61, at *20.  We will remand the case to the Appeals Office to give it an occasion to:

(1) explain why funds not received by petitioners because of mandatory deductions were treated as available to pay petitioners' back tax;

[*18] (2) review records previously made available by petitioners and consider whether or to what extent those records substantiate the amounts of petitioners' reported unreimbursed expenses, and, to the extent respondent concludes that petitioners had unreimbursed employee expenses, why funds so expended should be considered available to petitioners to pay their back tax;

(3) consider whether Arizona law affects petitioner wife's power as trustee to sell property held by her family trust; and

(4) determine whether special circumstances, such as age, restrict the full or partial liquidation of petitioner husband's retirement account to pay petitioners' back tax.

Upon remand we expect that the Appeals Office will consider any additional information or evidence that petitioners may wish to submit, any new collection alternative that petitioners may wish to propose, and any asserted change in circumstances.

To reflect the foregoing,

An appropriate order will be issued.